# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOHN HIGHMAN, | ) | CASE NO. 5:20-cv-803 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| PLASTIC PROCESS EQUIPMENT, INC., et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

This case involves a single claim of interference with rights afforded under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA").

Before the Court are fully-briefed cross-motions for summary judgment: Doc. No. 53, motion of plaintiff John Highman ("Highman" or "plaintiff") for judgment on liability, with a brief in support (Doc. No. 53-1); and, Doc. No. 54, motion of defendants Plastic Process Equipment, Inc. ("PPE") and Edward R. Kuchar ("Kuchar") (collectively, "defendants"), with a memorandum in support (Doc. No. 54-1). Defendants filed their opposition to Highman's motion (Doc. No. 58), and Highman filed his reply (Doc. No. 59). Highman filed his opposition to defendants' motion (Doc. No. 57), and defendants filed their reply (Doc. No. 60). The motions are ripe for determination.

## I. Legal Standards for an FMLA Claim

As guidance for this discussion and to better understand the significance of various portions of the fact recitation, the Court begins by setting out the statutes and regulations governing FMLA claims.

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the statute]." 29 U.S.C. § 2615(a)(1). To establish his claim for FMLA interference, a plaintiff must demonstrate that (1) he was an eligible employee; (2) the defendant was an employer as defined by the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied or interfered with the employee's FMLA benefits to which he was entitled. *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (citation omitted).

As a threshold matter, there is no dispute here that PPE is an "employer" subject to the FMLA and that Highman was an "eligible employee."

The FMLA regulations require covered employers to prominently and continuously post a notice explaining the FMLA's provisions and the procedures for filing complaints of violations. 29 C.F.R. § 825.300(a)(1). This notice must be posted even if no employees are eligible for FMLA leave. 29 C.F.R. § 825.300(a)(2). If an employer has FMLA-covered employees, the employer must also provide this general notice by including it in any employee handbook or other written guidance, or by distributing individual copies of the general notice to each new employee upon hiring. 29 C.F.R. § 825.300(a)(3).

It is undisputed here that PPE had FMLA-covered employees. It is also undisputed that the employee handbook, known as the "Company Policy," contained no directives relating to FMLA rights and/or FMLA leave. The record also contains no proof that any notice whatsoever, including posted notice and/or individual notice, was provided to PPE employees regarding their rights under the FMLA. In fact, although defendants supply a blurry, completely illegible and undated photograph of a "poster" they claim is their FMLA-notice-poster (with nothing to establish that it

2

was posted or where/when it was posted) (*see* Doc. No. 53-3, Ex. 2 to Kuchar Deposition), Highman denies ever having seen any such poster, as does his supervisor, Chris Miller. (Doc. No. 53-5 ¶ 10; Doc. No. 56-1 at 55.)

"[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave. . . . The employee's burden is not heavy." *Brohn v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) (ctitation omitted). "An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c). Further, "[w]hen an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." *Id.*

"[W]hen the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1). "In all cases, the employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." 29 C.F.R. § 825.302(c). "Failure [of the employer] to follow the notice requirements set forth in [the regulations] may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." 29 C.F.R. § 825.300(e).

"'Employees seeking relief under the [interference] theory must [also] establish that the employer's violation caused them harm.'" *Wallace,* 764 F.3d at 585 (alteration in original) (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)); *see also Ragsdale v.*

*Wolverine World Wide, Inc.*, 535 U.S. 81, 89, 122 S. Ct. 1155, 152 L. Ed. 2d 167 (2002) ("[section] 2617 provides no relief unless the employee has been prejudiced by the violation").

"'[I]f the employer [can show it had] a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct,' no violation exists under the FMLA." *Wallace*, 764 F.3d at 585 (quoting *Edgar*) (further citation omitted).

## II.     Factual and Procedural Background

Highman is a former employee of PPE (Doc. No. 53-5, Highman Declaration ¶ 2), a worldwide supplier of accessories for the plastics industry founded in 1974 by Kuchar (former president and current CEO of PPE) (Doc. No. 54-4, Kuchar Declaration ¶¶ 2–3). Highman was hired in January 2015 and worked as a "warehouse parts puller" (Doc. No. 53-5 ¶¶ 3, 4); his direct supervisor was Chris Miller (Doc. No. 55-1, Highman Deposition at 16).

On January 11, 2015, shortly after Highman was hired, he signed the following affirmation: "I, John Highman, have read and understand all terms and conditions of PPE's Company Policy and the added revisions and I agree to work under the provisions and rules of that policy." (Doc. No. 54-5, Plaintiff's responses to defendants' first requests for admission at 2 (No. 5) and at 32 (Ex. B).) Included in the Company Policy in effect at the time was the following provision regarding "Tardiness and Absence:"

> We expect every employee to be on time when reporting to work or returning from lunch. If unexpected or special situations arise that will cause you to be late, inform your Supervisor as soon as possible before your starting time. If you arrive for work late, report your arrival time to your Supervisor immediately. For repeated tardiness, for whatever reason, you will be given first verbal warnings and then written warnings. As with tardiness, frequent absence does affect your job and creates a hardship on co-workers or other employees and will result in termination of your employment.

4

(Doc. No. 54-5 at 22; Doc. No. 54-4 ¶ 4.) The policy also provided that "[u]nexcused absence or excessive absence by anyone will be just cause for either a written warning or immediate discharge depending on the severity and reasons for your absence." (Doc. No. 54-5 at 16.) There is no dispute that the Company Policy contained no specific directives addressing the FMLA, and a review of the document further confirms that fact.

In 2016 or 2017, Highman took vacation time to go to the Philippines to meet Janina, a Filipino woman he had first met in an internet group chatroom; he used additional vacation time in January and February 2018 to return to the Philippines to marry Janina. (Doc. No. 55-1 at 47–48, 51.) This exhausted Highman's vacation for that year. (Doc. No. 55-9, Ex. H at 1.) After returning from vacation leave in February, Highman missed work on several occasions between March and June 2018 for various reasons, including doctor appointments and unspecified "emergencies." (Doc. No. 55-6, Ex. E at 1.) As a result, on June 6, 2018, he was issued a written warning under the company attendance policy and was advised that "if there is another unexcused absence in the next six months . . . your position . . . [at PPE] will be terminated." (Doc. No. 55-7, Ex. F at 1.)

In late February or early March 2018, Highman learned that Janina was pregnant with their child and due to deliver in November 2018. (Doc. No. 53-5 ¶ 18.) In June 2018, Highman encountered Kuchar in a hallway at PPE and told Kuchar about his marriage and his wife's pregnancy. Highman claims he told Kuchar at that time that he wanted to take the month of November off to go to the Philippines for the birth of the child; Highman also claims that Kuchar indicated they would "work something out[.]" (*Id*. ¶ 20.) Although Kuchar had no recollection of Highman indicating in June how much time he would want to take, he did acknowledge that Highman "mentioned . . . in June [that his wife was pregnant], and that he might need time off to

5

go for the birth." (Doc. No. 53-2, Kuchar Deposition at 85.) Under FMLA regulations, this passing conversation between Highman and Kuchar was arguably enough to trigger the employer's FMLA notice duties. *See* 29 C.F.R. § 825.300(b)(1). But, there is no dispute that Kuchar did not advise Highman in June that he was entitled to FMLA leave for the birth of a child. In fact, Kuchar testified that he "didn't believe [Highman]." (Doc. No. 53-2 at 57; *see also id*. at 64.) Kuchar thought Highman's "credibility was so bad with all of his visits to the doctor[,]" and that "all of [Highman's] ailments were false,]" so that "the reasons [for wanting a month off] could be [false]." (*Id*. at 58, 64.)

Based on Kuchar's verbal response in June, Highman assumed he would be permitted to take four weeks off for the birth of his child and began telling people at work that he would be out for the month of November. (Doc. No. 53-5 ¶ 21.) One co-worker, Bruce Gutfranski, later documented that Highman had "boasted . . . he was going to take four weeks vacation to visit someone in Asia in November of 2018." (Doc. No. 53-8, Gutfranski Deposition at 52–53, and at 66 (Ex. 2).) Sometime shortly after speaking with Kuchar in the hallway, Highman purchased 30-day airline tickets to the Philippines (November 2, 2018 to December 2, 2018), believing that, the longer he waited, the more expensive the tickets would be. (Doc. No. 53-5 ¶ 22 and at 7 (Ex. 3).)

As the departure date neared, Highman approached Miller, his supervisor, to firm up the details about his request for time off. (*Id*. ¶ 24.) Miller testified that, when Highman said he wanted four weeks off, Miller told Highman he would need Kuchar's approval because Highman had already used all his vacation; Miller told Highman to talk to Kuchar. (Doc. No. 56-1, Miller Deposition at 30, 78.[1]) There is no dispute that at the time Highman approached his supervisor

---

[1] When initially questioned at his deposition about what Highman requested, Miller was evasive; but he later confirmed, on additional questioning, that Highman "told [Miller] that he was making arrangements for a month and [Miller] said . . . that was between [Highman] and the owners [the Kuchars]." (Doc. No. 56-1 at 78.)

with this request for time off, Miller never advised Highman that he was entitled to FMLA leave for the birth of a child; in fact, Miller actually suggested that Highman was asking for time he was not entitled to, therefore requiring a conversation with Kuchar.

To the extent there may now be disagreement over whether Highman ultimately asked Kuchar for one month off or for only two weeks, there is no dispute that Highman had initially asked his supervisor, Miller, for 30 days or a month. (Under the Company Policy, Highman was required to report attendance matters to Miller.) But Miller told Highman to talk to Kuchar. In fact, Kuchar testified that "Miller forewarned me and said, I think [Highman] is going to come talk to you because he's talking about taking four weeks unpaid leave." (Doc. No. 53-2 at 66.) It is clear that Kuchar (as well as Miller) understood Highman wanted time off—specifically four weeks— due to the anticipated November birth of his child, an FMLA-qualifying event.[2] (Doc. No. 53-2 at 65.) Even so, Kuchar, like Miller, never advised Highman that he was entitled to FMLA leave in that situation.

In any event, on September 19, 2018, as directed to do by Miller, Highman visited Kuchar in his office to talk about his request for leave. (Doc. No. 55-1 at 60.) Highman claims he requested 30 days leave, but Kuchar told him that, due to his poor attendance record, PPE would only allow two weeks. (Doc. No. 53-5 ¶¶ 25–26.) Kuchar insisted that Highman never asked for four weeks. (Doc. No. 53-2 at 67.) Instead, Kuchar claims when Highman came to talk, he said: "I want two weeks off." (*Id.* at 66.) When Kuchar told Highman that "rumor has it that you're asking for four weeks[,]" Kuchar claims Highman responded that he "just need[ed] two weeks off." (*Id.*) Kuchar

---

[2] Although the child's birth was expected in November 2018, she was born early—in October—and Highman was not there. He claims that, when he told Kuchar about his daughter's birth, instead of offering congratulations, Kuchar said: "[S]o you don't need to go now?" (Doc. No. 53-5 ¶ 35.) Highman felt Kuchar was "pressuring [him] not [to] take leave." (*Id.* ¶ 36.)

7

testified that he told Highman: "Even though you're under this threat of your attendance, you can take the time off." (*Id.*) Kuchar memorialized this conversation in a contemporaneously written "note to file" dated September 19, 2018 stating: " I said rumors have him going for one month which I said we couldn't agree to especially with his poor attendance record. He assured me he only needed 2 weeks off which I agreed to." (*See* Doc. No. 54-4 ¶ 7 and at 21 (Ex. B).)

Although Highman was disappointed with Kuchar's response, he claims that, since he did not know he had FMLA rights (because neither his supervisor nor the CEO told him) and he did not want to anger Kuchar or cause him to change his mind about giving him time off, Highman "just thanked [Kuchar] for the two weeks of leave and left his office." (Doc. No. 53-5 ¶¶ 8–9, 28.) After his conversation with Kuchar, Highman confirmed to Miller that he would be off for two weeks. (Doc. No. 55-1 at 68.)[3]

Highman departed for the Philippines on November 2, 2018, after leaving work a few hours early in order to catch his flight. (Doc. No. 53-5 ¶ 37.) Miller has no recollection that Highman asked to leave early, a failure that would have been a violation of PPE's attendance policy.[4] (Doc. No. 56-1 at 90.) Highman disputes that. (Doc. No. 53-5 ¶ 31.) When Highman left work, he told Miller he would see him in two weeks. (Doc. No. 55-1 at 69.) Therefore, PPE expected Highman would be back at work on November 19, 2018. (Doc. No. 56-1 at 90; Doc. No. 55-1 at 171.) Highman admits that he had not changed his 30-day airline ticket (which had him returning on

---

[3] In its reply brief, PPE misrepresents Highman's deposition testimony as to "what he told his supervisor before he left PPE for the Philippines[.]" PPE quotes Highman as saying: "I didn't mention anything about staying 30 days." (Doc. No. 60 at 2 (quoting Doc. No. 55-1 at 69).) The implication in the brief is that Highman admits he never requested 30 days off. But this takes the testimony out of context. In context, Highman was merely stating that, after he had spoken with Kuchar, he never continued to tell anyone at PPE that he would be gone for 30 days.

[4] In terminating Highman's employment, PPE never cited this violation as a reason.

December 2, 2018), "figuring it would be easier to address once [he] was in the Philippines[,]" and understanding that changing it before leaving would be more expensive. (Doc. No. 53-5 ¶ 30.)

On or about November 13, 2018, Highman's daughter (named "Janine") developed a bad rash all over her body. Highman and his wife feared the baby may have contracted dengue, a common illness in the Philippines that can be fatal to newborns. They immediately took her to the hospital, where they spent most of the day, ultimately being sent home to await test results. (*Id.* ¶¶ 41–43.)

On November 15, 2018, Highman received a message from Miller through Facebook asking how he was doing and wishing him a safe trip home. Highman responded within hours, advising Miller of his daughter's illness and indicating that he would be staying in the Philippines until she was better. (*Id.* ¶¶ 45–46.) Highman said: "Tell Ed sorry but her health comes first." (Doc. No. 54-5 at 56 (Ex. H).)[5] Miller never responded to Highman. (Doc. No. 53-5 ¶ 47; Doc. No. 56-1 at 41.) Notably, Miller once again never advised Highman that the illness of his daughter (like the birth of his daughter) was possibly a qualifying event under the FMLA, probably because Miller himself did not know that. (Doc. No. 56-1 at 42.)

On November 19, 2018, Miller wrote a memo to Kuchar in which he stated: "On Thursday, [November 15, 2018] [Highman] sent me a message via Facebook Messenger saying his child was sick and he was staying till child was well . . . . I feel this is an attempt to gain more time off. . . ." (Doc. No. 56-2, Ex. 1 at 1.) In a "note to file" dated November 20, 2018, Kuchar stated: "After

---

[5] In his deposition, Highman stated that his message was not a response to Miller's message, although it appears to be. Rather, Highman testified that he had already drafted his message to Miller *before* he received Miller's later message. Highman claims that the signal at the hospital was bad and that his message apparently did not get transmitted until later, when Highman went someplace where the signal was stronger. In addition, Highman testified that the time difference between the Philippines and the United States is 13 hours, but that text messages show up on one's individual device according to one's own time zone, making it difficult to determine when they were actually sent. (Doc. No. 55-1 at 106, 109, 142.)

reading [Miller's] report . . . it's obvious [Highman] has made a move to extend his leave beyond the 2 weeks he requested with me." (Doc. No. 57-4, Ex. 8 at 1.) Kuchar's note indicates his belief that Highman "lied right from the start!!" (*Id*.)

On November 30, 2019, Miller wrote another memo to Kuchar explaining that Highman's failure to return to work on November 19, 2018 would be construed as voluntary abandonment of Highman's position at PPE. (Doc. No. 54-4 ¶ 10 and at 23 (Ex. D).) Miller's memo further stated that "[a]s of today . . . I'm acknowledging that [Highman] has quit on his own free will and will not remain employed at [PPE]." (*Id.*)

On December 3, 2018, Highman sent Miller a Facebook message stating: "Hey, I didn't get in until 2:30 this morning. Going to get rested up and come in tomorrow." (Doc. No. 55-13, Ex. L at 2.) Miller responded: "U better call me. U were suppose [sic] to be back the 19th. Your job was not held." (*Id*.) Miller wrote a memo to Kuchar on that same day indicating that he had heard from Highmen for the first time since November 15, 2018 and reiterating that, in Miller's view, Highman had abandoned his employment at PPE. (Doc. No. 54-4 ¶ 11 and at 24 (Ex. E).) Kuchar "affirmed [Miller's] decision to terminate John Highman's employment for job abandonment and violation of PPE's Company Policy on attendance." (*Id*. ¶ 12.)

It is undisputed that defendants never advised Highman to request his leave in writing and/or to produce paperwork of any kind (*e.g.*, marriage certificate, birth certificate, hospital records) to document his circumstances (Doc. No. 53-2 at 72–73, 125, 167), although they are now claiming that was required (without any reference to the Company Policy).

On January 14, 2020, Highman filed his complaint against the defendants alleging a single count of FMLA interference.

10

## III.     Discussion

### A.     Summary Judgment Standard

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Once the moving party has presented evidence sufficient to support a motion for summary judgment, the party opposing the motion must present evidence supporting the claims asserted by that party. *Banks v. Wolfe Cnty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See*

11

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); s*ee also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

The standard for evaluation of motions for summary judgment does not change when, as here, there are cross-motions for summary judgment. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

*Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quotation marks and citations omitted). If it is possible to draw inferences in either direction, then both motions for summary judgment should be denied. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592–93 (6th Cir. 2001). The making of contradictory claims on summary judgment does not mean that if one is rejected the other must be accepted. *Id.*

## B.    Defendants' Motion for Summary Judgment (Doc. No. 54)

In their motion for summary judgment, defendants argue that they are entitled to judgment on Highman's sole claim for interference with the exercise of his rights under the FMLA because

12

they terminated Highman's employment for a legitimate reason having nothing to do with his FMLA rights. (Doc. No. 54-1 at 8.)

Here, there is no dispute that Highman was eligible for FMLA leave within the statutory requirements, that PPE was an "employer" as defined by the statute, and that the birth (and possibly the illness) of a child is a qualifying event.

In their motion for summary judgment, defendants argue that, even assuming Highman's November 2018 leave was FMLA-protected, his employment was terminated for a legitimate non-FMLA-related reason—because, after his two-week leave was over on November 19, 2018, he failed to either return to work or to report his continued absence to his supervisor as required by PPE's Company Policy and, therefore, was deemed to have abandoned his job. Defendants assert that Highman's November 15, 2018 Facebook message about his daughter's illness was ineffective to meet the reporting requirement because he had stated that his continued absence would be contingent upon whether or not his child's health improved. There is no dispute that Highman did not contact anyone at PPE in any way between November 15, 2018 and December 3, 2018. (Doc. No. 54-1 at 11–12; *see also id.* at 13 (quoting *Bacon v. Hennepin Cnty. Med. Ctr.*, 550 F.3d 711, 715 (8th Cir. 2008) ("an employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights.").)

Defendants cite the law correctly. But they are ignoring facts and principles, discussed more fully below, that render their argument ineffective. While it is true that Highman did not contact defendants after his two weeks of unpaid "vacation" were complete to advise them that he was not yet returning to work—which, under the Company Policy, would otherwise be a legitimate reason to terminate his employment—had Highman been informed of his right to FMLA leave and

13

granted the four weeks of FMLA leave that he had originally indicated he wanted (first by telling Miller and then also mentioning it to Kuchar) and to which he was entitled, the requirement to contact anyone at PPE would not have become effective until December 3, 2018. In fact, Highman did contact Miller on that date and was prepared to return to work but for being advised that he had already been fired. Therefore, as Highman argues, defendants' failing to inform him of his FMLA rights and denial of the FMLA leave to which he was entitled was the very act that caused Highman harm—but for not being informed that he was entitled to the four weeks he told Miller, his supervisor, he wanted for the birth of his child, Highman would not have been guilty of violating an attendance policy since he was entitled to take that much time—and more—in FMLA leave, and there would have been no need to report to Miller or PPE in mid-November and/or to "extend" his "vacation."

Defendants are not entitled to judgment on their defense that they had a legitimate non-FMLA reason for terminating Highman's employment. Defendants' motion for summary judgment (Doc. No. 54) is denied.

### C. Highman's Motion for Summary Judgment (Doc. No. 53)

Highman claims in his motion that defendants violated the FMLA in three ways: (1) by failing to provide Highman with any notice of his FMLA rights when Highman notified defendants that he required leave in November 2018 for the anticipated birth (and, subsequently, the unanticipated illness) of his child, rendering Highman unable to know his entitlement to the leave; (2) by discouraging Highman from taking four weeks of FMLA leave and only permitting him to take two weeks of unpaid vacation; and (3) by terminating Highman's employment due to "abandonment of his position" when Highman was absent for no longer than the original four weeks of entitled leave that he had indicated he wanted but PPE had refused to allow. Highman's

14

motion seeks judgment in his favor as to liability under the FMLA. In addition, Highman argues that defendants cannot show they acted in good faith, entitling him to judgment in his favor on that issue (for damages purposes). (Doc. No. 53-1 at 6.) The Court will address each separately.

### 1.    Defendants' Liability for FMLA Interference

The gravamen of Highman's argument is that defendants interfered with his exercise of his FMLA rights by failing to provide him with the required notice that would have enabled him to know and exercise his rights under the statute, leaving defendants free to limit his leave to two weeks rather than the four weeks they knew he wanted (and had originally told Miller he wanted) for the birth of his child, ultimately resulting in the termination of his employment for allegedly failing to timely return to work and/or properly seek an extension under PPE's attendance policy.

Here, as in *Haitz v. Don Jacobs Imports, Inc.*, No. 5:10-cv-307, 2011 WL 4743384 (E.D. Ky. Oct. 6, 2011), defendants are unable to prove that they met their general notice obligations. Defendants provided only "a blurry and unauthenticated photograph of a wall poster . . . [that] is largely illegible[.]" *Id*. at *3; *see also* Doc. No. 53-3, Ex. 2 to Kuchar Deposition (blurry, completely illegible and undated photograph of a "poster" with nothing to establish that it was posted or where/when it was posted). Highman denies ever having seen any such poster, as does Highman's supervisor, Miller. (Doc. No. 53-5 ¶ 10; Doc. No. 56-1 at 55.)

In addition, there can be no dispute that the Company Policy—which is in the record in several places—contains no mention of the FMLA, nor does it allude to anything suggesting FMLA-qualifying events or rights, although there is a section that discusses job-related injuries in the context of Ohio "Workmen's Compensation Insurance coverage." (*See, e.g.*, Doc. No. 54-4 at 10 (Ex. A).) When Kuchar was questioned during his deposition as to whether the employee handbook (*i.e.*, the "Company Policy") made reference to the FMLA, he did not know. (Doc. No.

53-2 at 27.) When asked whether it would "make sense to put it in the handbook" so the employer could be sure (due to the employee's affirming signature) that the employee would "know about their rights under the FMLA," Kuchar also did not know and stated that "[n]obody has ever asked me for FMLA time off[]" since "[t]he words 'FMLA' never came out." (*Id*. at 27–28.) In Kuchar's view, for an employee to receive FMLA leave they have to say specifically that they want it. (*Id*. at 28.)

Also as in *Haitz*, defendants "misunderstand[] the [r]egulation's clear mandate: the employer must provide the employee notice of FMLA eligibility once the employer learns that the leave *may* qualify as FMLA leave." *Haitz*, 2011 WL 4743384, at *4 (emphasis in original). When Highman advised Kuchar *in June* (and Miller in September) that he would need time off due to his child's anticipated birth, Kuchar (and Miller) did not investigate that request and/or provide timely notice to Highman whether he would need to supply more information, nor did they advise Highman of his FMLA rights. Therefore, defendants' current argument that Highman failed to request his leave in writing is unavailing, as is their emphasis on the alleged "material" factual dispute about what amount of leave was actually requested. In June (before there was any "dispute" as to the length of the leave requested), defendants had already violated their notice requirements under 29 C.F.R. § 825.302(c). They also violated PPE's notice duty in September when Highman told Miller, who then told Kuchar, that he wanted four weeks to attend to the birth of his child.

Moreover, when (at Miller's direction) Highman again approached Kuchar in September 2018 to confirm his request, Kuchar also failed to provide notice to Highman that he was entitled to FMLA leave and also failed to inform him that he was entitled to more leave than he was actually being allowed (*e.g.* the one month that Kuchar already knew Highman wanted—both from being tipped off by Miller and also from Kuchar's June 2018 conversation with Highman), nor did

16

Kuchar advise Highman as to any additional requirements (such as paperwork or proof of the birth post-leave).[6] In Kuchar's mistaken view, since Highman never mentioned the FMLA, as the employer, he had no duty to provide Highman with FMLA leave. Kuchar testified:

Q.      Has anyone ever asked you for time off for a reason that would be covered by the FMLA?

A.      Yes.

Q.      How is that different than asking for FMLA in your mind?

A.      The words "FMLA" never came out.

Q.      I see. So is it your belief that for an employee to receive FMLA they have to say specifically "I want FMLA"?

A.      Yes.

* * *

Q.      But you understand [Highman] was asking for leave?

A.      He was asking for two weeks off without pay. It had nothing to do with FMLA.

Q.      But he told you why he was asking for two weeks off, correct?

A.      Had nothing to do with FMLA.

Q.      Okay. Did he tell you why?

A.      Yes.

Q.      Why did he tell you he needed two weeks off?

A.      His wife was expecting a baby, he wanted to go there for the birth, I need two weeks off.

Q.      Okay. And you testified earlier that the birth of a child is one of the reasons a person can receive FMLA, right?

---

[6] It is perhaps not surprising that Kuchar failed to fulfill PPE's obligations with respect to the FMLA because, although acknowledging that PPE was subject to the FMLA, Kuchar (PPE's principal) admitted that he never "looked into" the requirements of the FMLA because he "[d]idn't have to." (Doc. No. 53-2 at 18–19, 126.)

       A.       If they ask for it.

       Q.       If they use the magic words?

       A.       Yes.

(Doc. No. 53-2 at 27, 45–46.) When pressed about whether the requirements of the FMLA notice regulations were met by PPE, Kuchar attempted to place all blame on Highman:

       Q.       Do you know if Mr. Highman was ever provided with a notice of rights and responsibilities under the FMLA in response to his request for time off for the birth of his child?

       A.       He didn't ask under FMLA.

       Q.       Does this "Employer responsibilities" [in the regulation] say he has to ask?

       A.       Well, wouldn't you assume that he should ask for that so I could grant that for him?

       Q.       It assumes he knows that the FMLA even exists, doesn't it?

       A.       That was up to him.

       Q.       Not your responsibility, right?

       A.       I wasn't the one having a baby or requesting time off.

(*Id*. at 121.) Kuchar also suggested that Highman might have been granted a month off had he said "pretty please" or "soften[ed] [Kuchar] up a little bit[.]" (*Id*. at 190.)

       Contrary to Kuchar's belief that Highman was required to use the "magic words" when requesting FMLA leave, the Sixth Circuit holds otherwise. In *Wallace*, the court stated:

       "[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) (citing *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 762 (5th Cir. 1995)). . . . Moreover, "[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The *employer* will be expected to obtain any additional required information through informal means." § 825.303(b) (emphasis added). The employee's burden is not heavy.

18

*Wallace*, 764 F.3d at 586.

Here, Kuchar does not dispute that Highman initially told him in June 2018 that he wanted to take time off in November for the birth of his child. (Doc. No. 53-2 at 86–87.) It is undisputed that Highman renewed his request for such leave both to Miller (his supervisor) and, in September of 2018, to Kuchar. (*Id*. at 66, 146.) Highman, who knew that he was already under a warning due to attendance problems, claims that he did not know he was entitled to more leave than Kuchar was willing to give him (*i.e.*, that he was entitled to the four weeks/one month/30 days[7] he wanted). Preferring not to annoy his boss, Highman simply agreed to settle for two weeks. (Doc. No. 53-5 ¶¶ 8–10, 28–29.)

It is disingenuous for defendants to argue that, even if they failed to give proper notice, Highman suffered no harm because he got the two weeks of leave he requested in September. (Doc. No. 58 at 3 (quoting *Edgar*, 443 F.3d at 507 ("[T]he FMLA is not a strict liability statute.")); *id*. at 4 (citing *Travers v. Cellco P'ship*, 579 F. App'x 409, 414 (6th Cir. 2014) ("When an employee receives all of the FMLA leave she requested, the employee has not been denied a benefit to which she was entitled.")).) *Travers* is distinguishable. There, although the plaintiff "argue[d] that [the employer] interfered with her FMLA benefits or rights by failing to provide her with a notification of her eligibility to take FMLA leave and failing to advise her of her rights under the FMLA at the appropriate time,]" the court found:

> The record demonstrates that Travers received information on her FMLA eligibility, rights, and responsibilities well in advance of her health conditions: Travers received training on the FMLA during her new hire orientation, and she knew where to go (either a particular supervisor or a website) if she needed additional information. In addition, MetLife, the third-party administrator who handles Verizon's FMLA requests, notified Travers of her FMLA rights and the relevant procedures in a letter sent one day after she had requested FMLA leave in

---

[7] Highman variously referred to the duration of his request.

November 2009, and soon after she requested additional FMLA leave in March 2010.

*Travers*, 579 F. App'x at 414 (record citations omitted). In that context, the court noted that Travers actually got all the leave she requested "and thus was not denied benefits *as a result of* any alleged violation." *Id*. at 415 (emphasis added).

Here, PPE's Company Policy contained nothing addressing FMLA leave. Even more specifically, unlike in *Travers*, Highman was not provided "information on [his] FMLA [rights][.]" *Id*. at 414. Nor did he "receive[] training" or "kn[o]w where to go . . . [for] additional information." *Id*. He received no directives about "relevant procedures" after either of his requests for leave (both informal and formal). *Id.* In the end, Highman did *not* get the four weeks of leave he was *entitled* to and originally indicated he wanted both when he spoke to Kuchar in June and when he officially approached his supervisor, Miller, to request the leave. This denial of benefits *directly resulted* from lack of *notice* by PPE that Highman was entitled to four weeks, which caused him to settle for the two weeks Kuchar ultimately permitted.

Even assuming, which is not proven from this record, that in September 2018 when Highman met with Kuchar, Highman *did* only ask for two weeks, he did so because he did not *know* he was entitled to more time and therefore could insist on it. Defendants argue that there is a factual dispute as to how much time Highman requested—which precludes summary judgment on his claim.[8] But, in September, defendants already knew (and do not now dispute) that, on two

---

[8] Defendants also claim that Highman "admits that based on Kuchar's contemporaneous note to file, he only requested two weeks' [sic] off for his travel to the Philippines." (Doc. No. 58 at 5 (citing Doc. No. 55-1 at 63–64.).) This is a misrepresentation of the actual testimony, which was as follows:

> Q.  . . . But this document states that you stated in that September 19, 2018, meeting, that you . . . only needed two weeks off? That is correct that that is what it says?
>
> A.  That is what it says, yes.

earlier occasions, Highman had already indicated that he wanted four weeks off to travel to the Philippines for the birth of his child. But, because of his previous attendance problems, defendants only *allowed* him two weeks off—violating the FMLA both as to the time it permits and as to Highman's notice rights, which Kuchar himself understood:

> Q.   . . . Do you dispute that Mr. Highman would have been entitled to FMLA leave if he asked for FMLA?
>
> A.   No, I don't dispute it. I would have given it to him.
>
> Q.   Okay. You don't dispute it?
>
> A    No, I don't. And it's the law.
>
> Q.   And it would have been whether it were four weeks, eight weeks or 12, right?
>
> A.   I would have given it to him just like any other employee in the past.
>
> Q.   Okay. And you wouldn't have told him I don't think you should have this time off because you've been absent so much or anything like that?
>
> A.   No. Never would I have done that.
>
> Q.   Never would do that?
>
> A.   Never did it before. I wouldn't have done it then.
>
> Q.   Okay. You agree it's improper for an employer to tell someone who is entitled to FMLA, No, you can't have it?
>
>    MR. CONGENI: Objection. Calls for a legal conclusion. Go ahead and answer.
>
> A.   That's right.
>
> Q.   Would it be improper for an employer, in your opinion, not as a lawyer, would it be improper for an employer to say, well, I'm only going to let you take this much FMLA leave?

---

(Doc. No. 55-1 at 63–64.) Highman merely confirmed the contents of the document, not the truth of the statement. In fact, immediately before this testimony, Highman insisted that he "requested 30 days[,] . . . [but] was told that . . . they could only do two weeks." (*Id*. at 63.)

A.    That would have been improper, yeah.

(Doc. No. 53-2 at 68–69.) Despite this understanding of the law, during the September 2018 meeting, Kuchar told Highman he would not agree to four weeks leave. (*Id.* at 87 ("Q. Did you ever tell Mr. Highman we can't agree to four weeks? A. At that point, yes.").[9]) Highman settled for the two weeks because he did not know he was entitled to more under the FMLA; and he did not know that because defendants failed in their notice responsibilities. Highman was prejudiced by this lack of notice.

As already noted in the ruling on defendants' motion for summary judgment, had defendants granted the *four weeks* of leave that Highman wanted for the birth of his child (and to which he was entitled), defendants could not have faulted him for failing to contact PPE after *two weeks* of leave. His December 3, 2018 contact with Miller would have been timely and would not have constituted another violation of PPE's attendance policy, about which he had already been warned. Kuchar himself confirmed that fact:

Q.    Had Mr. Highman been on FMLA leave for 30 days during that time period
      from November to the beginning of December, none of that -- his not
      returning on the 19th would not have been an issue, right?

MR. CONGENI: Objection. Hypothetical. Speculative. Do the best you can.

A.    Well, if he was off for 30 days under FMLA, then he wouldn't have been
      due back the 19th.

Q.    Then he wouldn't have been fired for that, right?

MR. CONGENI: Objection. Speculative. Hypothetical. Go ahead and
answer.

---

[9] In a "Note to file" dated September 19, 2018, Kuchar stated: "I said rumors have him [Highman] going for one month *which I said we couldn't agree to* especially with his poor attendance record." (Doc. No. 54-4 at 21 (Ex. B) (emphasis added).)

> A.   He wouldn't have been fired for that. He would have been fired for his next infraction.
>
> Q.   If there was a next infraction. We don't know, right?
>
> A.   Yes.

(Doc. No. 53-2 at 103.)

In fact, contrary to what defendants argue in opposition to Highman's motion, had Highman been granted the leave to which he was entitled, he would have had no need to contact anyone from PPE prior to his returning to work because he would not have needed an extension of his leave (due to his daughter's illness[10]) nor would he have been returning late. (*See e.g.*, Doc. No. 53-5 ¶ 52 ("I originally wanted my leave to run from November 5, 2018 through December 5, 2018[.]").[11]) In short, there would have been no grounds for PPE's termination of Highman.

Highman's termination of employment was "a direct result of . . . [defendants'] failing to meet [their] responsibilities [regarding notice of FMLA rights]." *Wallace*, 764 F.3d at 590 ("when the absences and cause for discharge relate directly to the FMLA leave and the company's failure to give notice, as they do in this case, there is no legitimate and independent reason for dismissal"). Defendants' failure to provide the required notice to Highman of his entitlement to FMLA leave, as well as their termination of his employment for allegedly failing to timely contact them after his "short-changed" leave, amounted to interference with Highman's FMLA rights. *See Marshall v. The Rawlings Co., LLC*, 854 F.3d 368, 384–85 (6th Cir. 2017) ("[FMLA] [i]nterference occurs

---

[10] Defendants argue that, while they are not conceding that Highman's daughter's illness was a qualifying FMLA event, even assuming it was, Highman failed to properly seek an extension of his approved leave. (Doc. No. 58 at 10.) This fails to acknowledge that no extension or approval would have been required if Highman had been originally given the four weeks he wanted. Everything that happened occurred within those four weeks.

[11] Highman characterizes this as "30 days" (Doc. No. 53-5 ¶ 52); but it is actually 31 days. Under the facts of this case, that discrepancy is irrelevant, since PPE officially fired him on November 30, 2018 (not on either the 30th or the 31st day of his entitled leave). (*See* Doc. No. 54-4 at 23 (Ex. D).)

23

when an employer 'shortchange[s] [an employee's] leave time, den[ies] reinstatement, or otherwise interfere[s] with [an employee's] substantive FMLA rights.'") (citation omitted).

Defendants' entire reliance upon the undisputed facts that Highman neither returned to work as expected on November 19, 2018 (and as he admittedly had indicated he would when he left (*see* Doc. No. 55-1 at 69)), nor contacted anyone at PPE after November 15, 2018 to request additional leave beyond the original two weeks, is misplaced. The arbitrary two-week deadline imposed by defendants was not justifiable under the requirements placed on employers by the FMLA. Highman was entitled to more leave than he was given but did not know that because he was denied the notice of his rights to which he was also entitled and which would have put him in a position to understand and insist upon those rights. Admittedly, it would be different if Highman indeed only wanted two weeks leave (even FMLA leave) and then failed to either return or to request an extension in the form required by his employer when his daughter unexpectedly became ill. But Highman requested four weeks and only agreed to a two-week leave because he felt pressured by his employer and neither knew he could insist on more nor that his personal attendance record was irrelevant for FMLA purposes. Defendants will not be permitted to benefit from the unlawful situation they created by failing to inform Highman of his FMLA rights and, not surprisingly, they point to no case law that says they should. In fact, the very case law defendants cite supports a conclusion that their termination of Highman's employment was "causally related to the [defendants'] failure to comply with FMLA notice requirements, and therefore constituted FMLA interference." (Doc. No. 58 at 6 (citing *Wallace*, 764 F.3d at 590–91; *Casagrande v. OhioHealth Corp.*, 666 F. App'x 491, 497–98 (6th Cir. 2016)).)

Highman is entitled to summary judgment on liability with respect to his FMLA interference claim.

## 2.    Defendants' Lack of Good Faith

Highman also asks for a ruling that defendants did not act in good faith when they interfered with his FMLA rights. (Doc. No. 53-1 at 26.) "Good faith" is of consequence when considering damages. Although a jury will need to decide the issue of compensatory damages, those damages will be automatically liquidated (*i.e.*, doubled) unless defendants prove both "that the act or omission which violated [the statute] was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation[.]" 29 U.S.C. § 2617(1)(A)(iii). In that situation, this Court would have discretion to exclude or reduce such liquidated damages. But the Sixth Circuit has recognized that there is "strong presumption under the [FMLA] statute in favor of doubling [the damages]." *Thom v. Am. Standard, Inc.*, 666 F.3d 968, 973 (6th Cir. 2012) (citation and internal quotation marks omitted; alteration in original).

In opposition to Highman's request in this regard, defendants argue that the record establishes that they acted in good faith by terminating Highman for violations of PPE's attendance policy, unrelated to any FMLA-protected leave. (Doc. No. 58 at 12.) But the question is not whether they thought they had a good reason for terminating Highman's employment. Rather, "[t]o establish good faith under the FMLA, a defendant must show that 'it honestly intended to ascertain the dictates of the FMLA and to act in conformance with it.'" *Thom*, 666 F.3d at 977 (quoting *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 868 (8th Cir. 2006)).

On this record, defendants cannot establish good faith under the *Thom* standard. The record shows that defendants admit all of the following:

- they never researched the FMLA or took steps to ensure compliance despite being aware of their status as an FMLA-covered employer for over a decade (Doc. No. 53-2 at 20, 36–37, 125–26);

- they failed to comply with even the bare minimum general notice requirements of the FMLA (*Id.* at 16, 20, 36–37, 125–26; Doc. No. 54-5 at RFAs 4, 5, 121, 14, 15);

- they knowingly failed to advise Highman of his FMLA rights or to grant him the leave he required because Kuchar did "not believe" Highman was married (Doc. No. 53-2 at 57–58);

- they did not inform Highman of his FMLA rights because he did not use the "magic words" — FMLA (*Id*. at 28, 45–46); and,

- they suggested that Highman should have "soften[ed] up" Kuchar and should have said "pretty please" to be granted FMLA leave (*Id*. at 189–90).

The Court concludes that, for all the reasons set forth above and on this record, Highman is entitled to the determination that defendants did not act in good faith.

## IV.    Conclusion

For the reasons set forth herein, defendants' motion for summary judgment (Doc. No. 54) is denied, and plaintiff's motion for partial summary judgment as to defendants' liability on his FMLA interference claim and on defendants' lack of good faith (Doc. No. 53) is granted.

This case shall proceed to trial on the issue of damages in accordance with dates and deadlines that will be established by the Court in a separately published trial order.

**IT IS SO ORDERED**.

Dated: February 23, 2022

_____

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**